UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 13-39 (01) |
| VERSUS | JUDGE ELIZABETH ERNY FOOTE |
| RICKEY NIKKI BEENE | MAGISTRATE JUDGE MARK L. HORNSBY |

## MEMORANDUM RULING

Before the Court is a Motion to Suppress evidence and statements [Record Document 21], filed by Defendant Rickey Nikki Beene. The Government opposed the motion. [Record Document 26]. The Court held an evidentiary hearing over the course of three days: June 13, June 14, and July 1, 2013. At the close of the hearing, the Court ordered and received further briefing from both parties. [See Record Documents 44 and 49]. The matter is now ripe. For the reasons that follow, the Motion to Suppress [Record Document 21] is hereby **DENIED in part and GRANTED in part**.

## BACKGROUND FACTS[1]

This case arises out of events that transpired on June 1, 2012 in Haynesville, Louisiana. On that date, several officers, including Danny Mills and Trent Crook, were at some sort of social gathering at Haynesville Chief of Police Anthony Smith's house. Shortly after 6:00 p.m., Claiborne Parish Sheriff (CSP) deputies and Haynesville Police

---

[1] The facts are taken both from the factual background contained in the Government's Memorandum in Opposition to Defendant's Motion to Suppress, as well as the testimony provided at the suppression hearing held on June 13, June 14, and July 1, 2013. [Record Documents 26, 40, 41, and 42].

Department (HPD) officers responded to a dispatch call stating that a subject had brandished a gun near the Mill Street Apartment Complex.[2] The subject was identified by dispatch and, subsequently, the law enforcement officers, as the Defendant, Rickey Nikki Beene.[3] Soon thereafter, the Defendant allegedly left the apartment complex in a grey or silver Honda Accord and drove to his residence, where he was immediately confronted by law enforcement officers. According to the testimony given at the suppression hearing, the first officer on the scene was Danny Mills, who arrived at the residence at almost the exact moment the Defendant pulled into his driveway.[4] As described by Officer Mills, both he and Defendant immediately exited their vehicles. After Defendant refused several commands to stop and place his hands on the trunk, Officer Mills pulled his Taser gun.[5] Without having to deploy the Taser, Officer Mills was

---

[2] Government Exhibit 1, Claiborne Parish Dispatch Log, shows an entry at time "1818," which states "Rickey Beene Gray Honda Accord behind Mill St pulled gun. PD 8/7 disp." [Record Document 40, p. 14, exhibit introduced through testimony of HPD Officer Danny Mills]. "PD 8" is apparently Officer Mills' unit, while "PD 7" apparently refers to Officer Trent Crooks' unit. [Record Document 40, p. 96].

[3] It was repeated several times through testimony at the suppression hearing that the Defendant was known to the relevant officers to have a reputation as a drug dealer. [Record Document 40, p. 21, lines 14-24 (Officer Mills); p. 109, lines 11-25, and p. 110, lines 1-2 (Officer Crook); p. 123, lines 1-2 (Officer Goode); Record Document 41, p. 14, lines 19-23 (Chief Smith)].

[4] Officer Mills testified that he was at Chief Smith's house when he heard the dispatch call. He departed the chief's house in a marked HPD unit and headed toward Mill Street Apartment Complex. On the way, Officer Mills received word that the subject had left the scene. Knowing where Beene's residence was located, Officer Mills decided to head in that direction. Ultimately, Officer Mills and Beene arrived at Beene's residence at almost the exact same time. Officer Mills "met face to face with Mr. Beene in the Honda Accord, and he turned into his driveway." At that point, Officer Mills "pulled sideways behind him[,]" on Greer Street, blocking Beene's car in the driveway. [Record Document 40, pp. 22-25].

[5] Officer Mills testified that his commands served a dual purpose of protecting both himself and the Defendant [Record Document 40, p. 26].

finally able to convince Defendant to drop to the ground. At that time, Defendant Beene was placed under arrest.[6]

The next two officers, who arrived in separate units on the scene, were HPD Officers Trent Crook and Rickey Goode, who was with the canine unit and handled the dog. It appears that Officer Crook arrived just minutes after Officer Mills and seconds before Officer Goode.[7] The officers' testimony appeared consistent to the extent that Officer Crook was ultimately the one to handcuff the Defendant and place him in a patrol unit parked on the scene at Beene's residence. Furthermore, both Officers Mills and Crook testified as having advised the Defendant of his Miranda rights at the scene of his arrest.[8]

At the time of the first two officers' arrival on scene, the Defendant's wife, Shauntae Heard Beene (referred to at the suppression hearing as "Ms. Heard"), was

---

[6] Officer Mills testified that he believed he had probable cause at that time to arrest Defendant for both resisting an officer (failure to comply with Officer Mills' commands) and brandishing a firearm (based on both Officer Mills' knowledge of Beene and the dispatch call) [Record Document 40, p. 28].

[7] Officer Crook testified that, when he arrived at Beene's residence, "Deputy Mills had Ricky Beene out of the car; had his Taser pointed at him. Ricky was on his stomach, on the ground... I got out and assisted Officer Mills in handcuffing [Beene]." Officer Crook then stated that he took Beene to his patrol unit and read Beene his Miranda rights off of a card. At that time, Beene was sitting in Crook's patrol unit with the door open, while Crook was standing outside of it [Record Document 40, pp. 97-98]. Officer Goode testified that, when he arrived at Beene's residence, he saw "Officer Mills had Ricky Beene outside of [Beene's] vehicle, behind his vehicle, on the ground. At first, I actually thought he had him at gunpoint; but as I approached, I noticed that it was his Taser. I heard him giving verbal commands to, you know, basically put his hands behind his back, and that's when I observed a black female walking around the trailer, from the front of the trailer to the back, heading towards Officer Trent Crook and Officer Mills. And they was -- they were unaware, you know. But she was hollering and screaming. I run up and basically cut her off before she got to the officers, and held her there and tried to keep her calm until we could figure out what was going on." [Record Document 40, p. 124].

[8] Record Document 40, p. 31, lines 1-11 (Officer Mills) and p. 98, lines 6-24 (Officer Crook).

sitting in another car parked on the front lawn of the residence.[9] At some point during the arrest of Defendant Beene, Ms. Heard had emerged from her vehicle and was approaching the area where the Defendant, his vehicle, and the officers were located. By all accounts, Ms. Heard was upset by the scene. Upon Ms. Heard's claim that the Honda Accord driven by Defendant Beene actually belonged to her and she did not consent to a search thereof,[10] Officer Goode deployed the drug-sniffing dog.[11] Officer Goode testified that he ran the dog around the car because of Defendant Beene's "known reputation as far as being a drug dealer there, basically."[12] The dog alerted on at least four different areas of the car– the driver's side-door; the front left bumper near the tire; the trunk; and the passenger doors.[13] After multiple alerts, the dog was returned to the unit, and the officers searched the vehicle and found drugs, a gun, and a wallet containing almost one thousand dollars in cash.[14]

While Officers Mills and Goode were conducting the vehicle search, Ms. Heard was accompanied by Chief Anthony Smith and, at least for part of the time, Officer

---

[9] The residence is consistently described as a trailer, and it seems to be undisputed that Ms. Heard was sitting in some model of a Lincoln automobile.

[10] Although Chief Smith testified that Ms. Heard gave consent for the officers to search the vehicle, the Court finds that testimony to be incredible in light of the firsthand accounts by Officers Mills and Goode, who conducted the vehicle search and who recounted the events similarly to one another. [Record Document 41, pp. 28-29].

[11] Record Document 40, pp. 33-34, 125-126.

[12] Id. at p. 126, lines 3-4.

[13] Id. at p. 127, lines 1-9.

[14] Id. at pp. 128-129.

Trent Crook.[15][16] At one point, Ms. Heard became somewhat hysterical and apparently fainted, necessitating the arrival of emergency medical personnel.[17] Ms. Heard was ultimately determined to be fine and not at any health risk. Thereafter, Detective Adrian Malone with the Claiborne Parish Sheriff's Office arrived on the scene, at the request of Chief Smith.[18] Chief Smith testified to having obtained Ms. Heard's written consent to search the house, which was somewhat corroborated by Detective Malone,[19] who claims to have been present when the form was signed by Ms. Heard.[20]

---

[15] To place Chief Smith's arrival at the scene in the context of other events, he testified that, upon his arrival, Defendant Beene was on the ground, with Officer Mills pointing his Taser gun at Defendant, and Officer Crook attempting to handcuff Beene. Smith further testified that Ms. Heard was yelling at the officers; "she continued to interfere, and I detained her." [Record Document 41, p. 20].

[16] The Court now knows that Ms. Heard was, in fact, charged with and convicted of resisting an officer, for which she paid a fine to the HPD. [Record Document 42, pp. 84-85]. However, the testimony among the officers and Chief Smith conflicted as to whether Ms. Heard was ever under arrest, and in handcuffs, or just detained. [See Record Document 40, p. 103; but see Record Document 41, p. 20, line 24 ("We didn't arrest her, we just detained her."); p. 25, line 24 ("She was not under arrest."); p. 26, lines 13-17 ("'Under arrest,' she has committed a crime that constitute we're carrying her in and booking her. "Being detained for officer safety" is we detained her so she wouldn't continue violently go at my officers. She hadn't done anything at that time to really constitute an arrest.")]. Nonetheless, Ms. Heard testified that she was in fact placed under arrest, charged, and kept in jail overnight. [Record Document 42, p. 84]. The fact of Ms. Heard's arrest was corroborated by both Officers Crook and Mills, who testified that Chief Smith "told us 'Place her under arrest for resisting.'" [Record Document 40, p. 76, line 20]. This fact was ultimately agreed to by the Chief, who, on cross-examination, affirmed: "Yes, she was arrested." [Record Document 41, p. 45, line 19].

[17] Record Document 40, pp. 42-44, 103-104; Record Document 41, pp. 23-24.

[18] Record Document 41, p. 51, lines 5-19.

[19] Chief Smith testified that the only reason the officers entered and searched the house was because Ms. Heard adamantly requested that she be allowed to enter the residence and use the bathroom. [Record Document 41, pp. 31, 41] However, Detective Malone, who was supposedly present for the signing of the consent form and at least part of the discussions between Chief Smith and Ms. Heard, testified to not having heard any mention of Heard needing to use the bathroom. [Id. at pp. 54-55; p. 73, lines 8-10].

[20] Detective Malone originally testified that Chief Smith read the form to Ms. Heard. [Record Document 41, pp. 52-53]. However, upon being recalled to the witness stand, Malone clarified that he "wasn't standing right then (sic) when he was reading it. I walked over to him while they were in the middle of doing all that." And, later still, Malone stated, on cross-examination, that he witnesses Chief

The officers then searched the house, finding more drugs and a digital scale. According to Detective Malone's testimony, Beene was then taken straight to the police station, while Chief Smith and Detective Malone, among other officers, took Ms. Heard out to an area near a cemetery to search for more evidence.[21][22] After completing that search, Detective Malone returned to the police station. Although Malone himself never claimed to have advised Defendant of his rights, he testified that Officer Goode so advised Defendant at the station. The officers then completed an "advice of rights form," before taking a recorded statement from Defendant Beene.[23]

Defendant Beene was ultimately charged in a six-count indictment by a federal grand jury, with related forfeiture allegations.[24] Those charges include: one count for possession of a firearm by a convicted felon; three counts of possession with intent to distribute schedule II controlled substances; one count of possession with intent to

---

Smith fill out the entire consent to search form. [Record Document 41, p. 73, lines 19-23]. However, Malone did not waiver in testifying that he witnessed Ms. Heard signing the consent form. [Record Document 42, p. 101, lines 6-8].

[21] Id. at p. 75, lines 5-7.

[22] Id. at pp. 33-34, 56-58. Chief Smith's testimony again sharply deviates from that of Detective Malone regarding the details and timing of these events. While Chief Smith testified to this search taking "anywhere from an hour and a half to two hours" [Record Document 41, p. 35, lines 12-13], Malone testified that searching the cemetery "only took about, approximately, 15 to 20 minutes." [Id. at p. 75, lines 13-14]. And, yet another discrepancy exists between this version and that of the other officers, in that both Chief Smith and Detective Malone each testified that Ms. Heard was returned to her residence after searching near the cemetery and was never arrested that night. [Id. at pp. 36-37 (Smith), 57-58 (Malone)]. However, despite previously testifying to contrary multiple times, Chief Smith ultimately agreed, on cross-examination: "Yes, [Ms. Heard] was arrested." [Id. at p. 45, line 19].

[23] Record Document 41, p. 76, lines 5-11.

[24] Record Document 1.

distribute a schedule I controlled substance; and one count of possession of a firearm in relation to a drug-trafficking crime.

## CONTENTIONS OF THE PARTIES

Defendant argues that the evidence and statements should be suppressed for the following reasons: (1) the searched vehicle was parked squarely within the curtilage of the house; (2) the Government cannot meet its burden of proof that the use of the drug-sniffing dog created probable cause to search the automobile; and (3) the Government has not met its burden of proving that Ms. Shauntae Heard Beene's consent to search the residence was given freely and voluntarily.

On the other hand, the Government claims: (1) that the searched vehicle, which was parked in Defendant's driveway, was not considered part of the curtilage of Defendant's home; (2) probable cause was not required to use the drug-sniffing dog; and (3) Shauntae Heard Beene's consent to search the residence was freely and voluntarily given.

## LAW & ANALYSIS

It is undisputed that the Government bears the burden of proof, by a preponderance of the evidence, on the instant motion to suppress.[25] United States v. Hurtado, 905 F.2d 74, 76 (5th Cir. 1990) (collecting cases) (Government has burden at suppression hearings to prove, by a preponderance of the evidence, the voluntariness

---

[25] Record Document 40, p. 11, lines 1-5.

of a consent to a warrantless search, the voluntariness of a confession, the inevitable discovery of evidence, or the waiver of Miranda rights).

### The Vehicle

Although both parties seem to foreclose the possibility that this case might arguably involve a traffic stop,[26] the Court is reluctant to follow suit. Much is made of the physical location and position of Defendant's vehicle at the time of the search; however, no mention is made of the circumstances that led up to that scene. It is true that the facts are lacking two points commonly associated with traffic stops: a vehicle en route on a public road and evidence of pursuit by the officer, namely lights and/or sirens. Nonetheless, the Court finds little differentiating this factual scenario from that of a traffic stop, when we consider the totality of circumstances leading up to the scene at Beene's residence. See United States v. McLaughlin, 578 F.2d 1180, 1182-84 (5th Cir. 1978) (upholding an automobile search where car was parked in a private driveway, because car was not parked long prior to the search and officer had reasonable suspicion to approach car in driveway). As the Fifth Circuit stated in McLaughlin, "we decline to fashion a legal rule that automobile drivers are safe if they can make the sanctuary of the nearest private driveway or carport." Id. at 1183-84; see also United States v. Lenz, 162 F. App'x 379 (5th Cir. 2006) (stop that occurred in a driveway on defendant's property was properly analyzed under the reasonable suspicion standard).

---

[26] Neither brief even touches on the issue.

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity... occurred, or is about to occur, before stopping the vehicle." United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005). In making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). Here, the officers did not set out on June 1, 2012 to approach and apprehend Beene at his residence. Instead, the officers' purpose was to respond to a dispatch call, alerting them to the possibility that a known drug dealer had brandished a firearm. In so responding, the officers intended to apprehend the Defendant as soon as possible for purposes of further investigation.[27] While en route to the location originally dispatched, the officers received further dispatch reports, informing them that the Defendant had left that location. In an attempt to find and stop Defendant in the small town of Haynesville, Louisiana, Officer Mills and Defendant ultimately arrived at the residence at the same time, at which point a lawful stop, based on reasonable suspicion, occurred.[28]

---

[27] Record Document 40, pp. 81-82 (Officer Mills represented that it was his intent to stop Beene based on the information received from the dispatcher and other officers; had Beene not turned into the driveway, Mills would have stopped him still); Record Document 40, p. 115 (Officer Crook testified that he planned to "attempt a traffic stop" and investigate further, if he saw Defendant's gray Honda); and Record Document 40, pp. 121-122 (Officer Goode likewise indicated that he intended to stop Defendant Beene and investigate further, if he came across Defendant driving his Honda Accord).

[28] Id. at p. 81 (Officer Mills testified: "When I turned in on Greer Street, I met him. I turned east onto Greer Street; he was coming west on Greer Street. And I made my turn-in close at the house, and I met him head on. And then he turned and went into the driveway.").

Notwithstanding our finding of a lawful stop, the Court will now address the parties' arguments regarding the location of the vehicle and whether its position in the driveway brought the vehicle within the curtilage of Defendant Beene's residence. We find, for the reasons that follow, that the vehicle was not parked within the home's curtilage.

The Fourth Amendment's prohibition against unreasonable searches and seizures is not limited to the structure of the home itself, but includes the home's curtilage. See Oliver v. United States, 466 U.S. 170, 180 (1984)(recognizing that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself). A four-factor test is used to determine if an area is within the curtilage of the house: (1) the proximity of the area to the home, (2) whether it is within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from outside observation. United States v. Thomas, 120 F.3d 564, 571 (5th Cir. 1997) (citing United States v. Dunn, 480 U.S. 294, 301 (1987)). As the Supreme Court has explained, these factors are not meant to provide an exact formula, which would yield the correct answer to all extent-of-curtilage questions. See Dunn, 480 U.S. at 301. Rather, they "are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration– whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment Protection." Id.

In assessing the facts of this case in light of the four factors enunciated above, it is helpful to explore how other courts have conducted similar analyses. In United States v. Moffitt, 233 F. App'x 409, 411 (5th Cir. 2007), the Fifth Circuit held that a defendant's driveway and yard were "not areas 'so intimately tied to the home' that they [were] protected curtilage." Although the court found that the first two factors weighed in favor of the area being curtilage –the driveway was directly next to the house and defendant had enclosed the yard and house with a chain-link fence–the area was not curitlage because of the nature to which it was put to use. Id. "[The defendant's] driveway and front yard were access areas for visitors to enter and knock on the front door." Id. at 411–12. If "various members of society may enter his property, [the defendant] should find it equally likely that the police...will do so." Id. at 412. The defendant also failed the fourth factor, in that he did not take sufficient steps to protect the alleged curtilage from observation by passers-by because the chain-link fence was see-through, providing no protection from outside observation. Id.

Likewise, the Middle District of Louisiana recently found that a defendant's driveway was not part of the curtilage, where the driveway extended hundreds of feet out to a public roadway; neither the defendant's home nor the driveway were enclosed; the defendant did not use the driveway for any intimate purpose; and the defendant did not take any steps to shield the driveway from observation by passers-by. United States v. Ardoin, No. 10-29-JJB-CN, 2010 WL 4056191, at *3 (M.D. La. Oct. 14, 2010). Simmilarly, in United States v. Alvarez, 213 F.3d 636 (5th Cir. 2000), the Fifth Circuit upheld the trial court's finding that the defendant's driveway was not within the home's

curtilage, because the driveway was open to the plain view and use of passers-by in that the defendant had not taken steps to enclose it. See also United States v. Kessler, 165 F.3d 24 (5th Cir. 1998)(defendant's driveway not curtilage where fence enclosed a much larger area than the house itself, driveway was used by visitors and others for access to house, gates to the driveway were open, and owner had not taken any steps to indicate permission was necessary before using driveway); United States v. Ramirez, 145 F. App'x 915, 921 (5th Cir. 2005) (finding that a drainage canal was not within curtilage of the defendant's home where the canal was not within an enclosure surrounding the house, was not used by the defendant for any intimate purpose, and was accessible to the public from public streets).

Here, the only factor which could be argued in favor of the driveway being within the curtilage is the first factor, the proximity of the driveway to the home. Clearly, the remaining factors weigh heavily in favor of the driveway being outside of the curtilage, specifically: that there was no enclosure surrounding the driveway, in contrast to the fenced-in back yard and door; the defendant merely used the driveway as a means of ingress and egress for automobiles and parking and provided no testimony that it was used for any intimate purposes; and the defendant took no steps to prevent the outside observation or use by various passers-by. The Court received extensive testimony, over the course of the three-day hearing, regarding the physical parameters and relative positioning of Defendant Beene's trailer, lot, driveway, and back yard fencing. Based on the officers' testimony, as well as drawings and photographs of the physical scene, it is clear that the distance from the driveway to Defendant Beene's residence does not

bring the driveway within the curtilage of the home. Despite some testimonial discrepancies regarding the exact proximity of the residence to the vehicle, which varied from five to seven feet, the Court is confident that this particular driveway falls outside of the curtilage.

Finally, although Defendant dedicates the majority of his argument to the Supreme Court's recent decision in Florida v. Jardines, this Court finds that case easily distinguishable from the instant facts. 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013). In order to so distinguish, we need go no further than the first sentence of Justice Scalia's opinion, in which he enunciates the precise issue before the Court: "We consider whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment." Id. at 1413 (emphasis added). Just as there was no doubt in Jardines that the officers entered the curtilage, this Court has no doubt that the vehicle was outside the curtilage. Id. at 1415 ("Here there is no doubt that the officers entered [the curtilage]: The front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'")

### Use of the Drug Dog[29]

Having determined that the officers conducted a lawful stop of Defendant Beene's vehicle, which was outside the curtilage of his home, the issues of using the drug-sniffing dog is rendered moot. Pursuant to well-established Supreme Court

---

[29] For purposes of this hearing, neither the certification of the drug dog, "Eddy," nor the adequacy of his alerting, was at issue.

precedent, it is clear that "the use of a well-trained narcotics-detection dog–one that 'does not expose noncontraband items that otherwise would remain hidden from public view,'– during a lawful traffic stop, generally does not implicate legitimate privacy interests." Illinois v. Caballes, 543 U.S. 405, 409 (2005) (quoting United States v. Place, 462 U.S. 696, 707 (1983)). In this case, the dog sniff was performed on the exterior of Defendant's car while Defendant was lawfully detained. Here, as in Caballes, "[a]ny intrusion on [Defendant's] privacy expectations does not rise to the level of a constitutionally cognizable infringement." 543 U.S. at 409.

### Consent to Search the Residence

"A warrantless entry into and search of a dwelling is presumptively unreasonable unless consent is given or probable cause and exigent circumstances justify the encroachment." United States v. Santiago, 410 F.3d 193, 198 (5th Cir. 2005)(citing United States v. Jones, 239 F.3d 716, 719 (5th Cir. 2001)). Here, neither probable cause nor exigent circumstances have been asserted by the government as justifying the warrantless entry into and search of Defendant's residence. Rather, the government contends that Defendant's spouse, Ms. Heard, gave the officers consent to enter and search the residence. Defendant now disputes this contention. For the reasons that follow, the Court finds that Ms. Heard's consent, if given at all, was not valid or voluntary.

It is well-established that consent to search is one exception to the warrant requirement. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Jenkins, 46 F.3d 447, 451 (5th Cir. 1995). However, "[t]he voluntariness of consent

-14-

is a question of fact to be determined from a totality of the circumstances." United States v. Solis, 299 F.3d 420, 436 (5th Cir. 2002) (internal quotation omitted). The parties agree that courts must consider six factors in determining whether an individual voluntarily consented to a warrantless search: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." Santiago, 410 F.3d at 199 (citing Solis, 299 F.3d at 436 n. 21)(internal quotation omitted)).

     On the issue of Ms. Heard's consent, the Court is faced with complicating credibility determinations. As mentioned above, the Court heard three days of testimony at this suppression hearing. In assessing the testimony received, regarding the totality of circumstances surrounding the alleged consent to search, the Court is plagued with incredulity. On the one hand, Chief Smith's accounts fail to comport with almost all of the other officers' versions of the relevant events of June 1, 2012. Yet, on the other hand, Ms. Heard's testimony simultaneously leaves the Court with the distinct impression that she has tipped the scales in favor of her spouse. Neither of these witnesses endeared themselves to the Court, and the Court finds the sheer volume of inconsistencies between Chief Smith's testimony and that of the other officers to be remarkable. Although their disingenuousness is not to be minimized, the incredibility involved in their testimony does not approach the egregious display of misconduct evidenced by the falsifying of the consent form.

At the hearing, two versions of the consent form were produced. On one, Detective Malone's signature appeared as a witness.[30] Malone testified that he signed the form that day, on June 1, 2012, in the presence of Ms. Heard. The other version of the form –contained in the police file and faxed to counsel for the Government, who then turned it over to defense counsel as part of discovery– was identical in every way, except that it lacked Detective Malone's signature.[31] These inconsistencies lead the Court to doubt the voluntariness of Ms. Heard's consent.

The Court does note that Ms. Heard acknowledges signing the form but that she did so after being handcuffed and detained in the back of a patrol unit.[32] As noted above, the testimony by the officers as to whether Ms. Heard was arrested contains significant discrepancies. Defendant contends that Ms. Heard was coerced by threats from Chief Smith as to the welfare of her child and the police officers' refusal to allow her to use the bathroom until after she had signed the consent form.[33] Chief Smith denies any threats to Ms. Heard's child but his credibility is questioned by the Court as noted above and below.

Despite testimony from both Chief Smith and Detective Malone, representing that both officers were present for the signing of the consent form by Ms. Heard, there

---

[30] Government Exhibit 2, page 3, as described by Detective Malone to have contained the signatures of Chief Smith, Ms. Heard, and Detective Malone. [Record Document 41, p. 54].

[31] Defense Exhibit 2 (falsified version of consent form).

[32] Record Document 42, pp. 17-18.

[33] Record Document 42, p. 20.

exists indisputable evidence that the consent form was falsified. The exact extent of this fraud is unknown to the Court. However, of this, the Court feels certain: there exists a version of the consent form, dated July 19, 2012, which is identical in every way to the consent form allegedly signed on the scene on June 1, 2012, except that it does not contain the signature of Detective Malone.[34] The Court cannot fathom a plausible excuse as to why such a document might exist in a form other than that which has been testified to regarding the events of June 1, 2012.[35] For this reason alone, the Court finds reasonable grounds to suppress any evidence seized from the warrantless search of Defendant's residence.

The Court declines to further entertain the discrepancies among various witnesses. Instead, it suffices to say that the Court found both Ms. Heard and Chief Smith to be incredible on multiple points of legal significance, some of which have been described above.[36] Based on this Court's credibility determinations, the Court finds that all but the fifth, of the six factors quoted above, have been compromised. This Court

---

[34] Record Document 42, p. 110, lines 21-25.

[35] Much to the Court's disappointment, when confronted at the hearing with this duplicate version of the consent form, not bearing his signature, Detective Malone could provide no explanation for the discrepancy. [Record Document 42, p. 112, lines 1-8].

[36] As acknowledged at Footnotes 10, 16, 19, 20, and 22, Chief Smith's testimony is not corroborated in large or small part, by any of the other officers or the documentary evidence of the consent to search form. Chief Smith's testimony was incredible on many topics, including but not limited to: whether it was Chief Smith or Officer Goode who initially intercepted Ms. Heard at the scene; whether the officers obtained consent to search the vehicle; whether Ms. Heard made comments requesting permission to enter the house to use the bathroom or otherwise; whether Ms. Heard was ever placed under arrest; whether Ms. Heard was transported back to her residence or to the police station upon completion of the cemetery search; whether coercive statements were made by Chief Smith regarding Ms. Heard's children and her custody thereof; the length of time the officers spent searching the area near the cemetery; and in which patrol unit Ms. Heard was transported.

finds a complete dearth of credible testimony upon which to validate the consent allegedly obtained from Ms. Heard. Accordingly, the motion to suppress, to the extent it addresses the warrantless search of the residence and all seizures made therein, is hereby granted.

## CONCLUSION

For the foregoing reasons, the Court finds that the Government has met its burden, by a preponderance of the evidence, regarding the search of the vehicle and related seizures but has failed to meet its burden regarding the search of the residence. Accordingly, for the reasons set forth in this memorandum ruling, the motion to suppress [Record Document 21] is hereby **DENIED in part and GRANTED in part**, consistent with the findings herein.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE